33 So.2d 891

## WALKER et al. v. BAILEY.

### 6 Div. 429.

Court of Appeals of Alabama.
Oct. 28, 1947.

Rehearing Denied Nov. 25, 1947.

286

Ward & Ward, Tom B. Ward, Sr., and Tom B. Ward, Jr., all of Tuscaloosa, for appellants.

Mize & Spiro, Henry H. Mize, and Jonas Spiro, Jr., all of Tuscaloosa, amici curiac.

HARWOOD, Judge.

In the court below the appellants here, W. W. Walker and Frances Y. Walker, partners doing business under the partnership name of Walker Motor Company, sued the defendant below, appellee here, on a complaint containing three counts. Count one is in detinue, claiming one 1938 Model Master DeLuxe Chevrolet Coupe, with the value of the use thereof from 25 April 1946. Count two was withdrawn by the plaintiffs prior to submission of the case to the jury, so is not here involved. Count three claims the sum of $240.40, together with interest and attorney's fee, due by promissory note executed by the appellee.

The plaintiffs below executed a bond in connection with the count in detinue and the automobile described in the complaint was seized by the sheriff. The defendant below having failed to give the necessary

E. D. McDuffie and A. K. Callahan, both of Tuscaloosa, for appellee.

bond the plaintiffs below executed the bond required for delivery of the car to them.

For convenience the defendant below, appellee here, will be referred to hereinafter in this opinion as the defendant, and the appellants, plaintiffs below, as the plaintiffs.

The defendant filed demurrers to the complaint, and upon their being overruled he filed two pleas. Plea One is the general issue, and Plea Two is a special plea setting up that on the date of the sale of the automobile in question the plaintiffs were engaged in the business of buying and selling used automobiles in Tuscaloosa County, Alabama; that in such business they were subject to the provisions of the Federal Emergency Price Control Act of 1942, as amended; that the automobile in question was a commodity upon which a ceiling price of $409.87 had been placed; that the defendant paid the plaintiffs for the purchase of said automobile $580 in cash, and executed promissory notes totalling $287.40 for the balance due; that the notes and mortgage securing same executed by the defendant and now the basis of this suit represented an amount in excess of the ceiling price fixed under the provisions of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A.Appendix, § 901 et seq., and are· therefore void and illegal.

The plaintiffs' demurrer to plea Two was overruled. It was then agreed between the parties that the pleading would be in short by consent, each party having the right to give in evidence legal proof of any matter in defense of the pleas or of the complaint that could be well pleaded.

A jury trial resulted in a verdict for the defendant, and judgment was entered pursuant thereto. The plaintiffs' motion for a new trial being thereafter duly filed and by the court overruled they perfected their appeal to this court.

In the trial below the evidence introduced by the plaintiffs was directed toward showing that Frances Y. Walker was a silent partner in the Walker Motor Company, and in no way participated in the active operation of the firm's business. W. W. Walker was the manager of the business. He testified that he sometimes sold automobiles belonging to the firm, and that he also operated a finance company in connection with the automobile business.

From this point on the direct and cross examination of the witnesses for both parties shows that Max Walker, son of the plaintiffs, and Francis J. Gary, their son-in-law, were around the plaintiffs' place of business a considerable portion of the time when the transaction around which this case centers was consummated. W. W. Walker testified that no salesmen were employed by the Walker Motor Company at this time, but on cross examination admitted that Max Walker and Gary would sometimes sell cars belonging to the Walker Motor Company, for which they received a 5% commission. Gary had spent some three or four months at the Walker Motor Company, including the month of April, 1946. Max Walker had been so occupied for several years. During the time they were at the Walker Motor Company neither was otherwise gainfully employed. According to W. W. Walker "They were around the place of business there and sometimes helped me in various things, but not on a salary." Max Walker would sometimes take in money for the Walker Motor Company and issue receipts therefor.

Max Walker and Gary, in their car selling activities used the Walker Motor Company used car lot and service station. They paid no rent or taxes in such connection, and neither had a license as automobile salesman or used car dealer. It is clearly inferable from the evidence many of the cars sold by Max Walker and Gary were sold at prices above the O.P.A. ceiling.

Grady Morrow, a witness for the plaintiffs, testified that he was employed by them for some several months beginning 11 April 1946. During the time he was so employed this witness could not recall that W. W. Walker had ever sold a car, and stated that Max Walker and Gary were the salesmen, other than himself, connected with the Walker Motor Company.

W. W. Walker's testimonial contention was that Max Walker and Gary were ·completely "on their own" as to all sales made

by them, other than when they sold cars owned by the firm, when he paid them a 5% commission; that they were in no way connected with or employed by the firm; that he sometimes would finance sales made by them in their individual capacity, but only in the status of a disinterested and innocent third party.

At the time of the sale of the automobile, involved in this suit, and prior thereto, a decree had been issued by the United States District Court enjoining W. W. Walker from selling automobiles at prices above the O.P.A. ceiling.

On or about 22 April 1946 Alvah R. Purvis, then owner of the automobile involved here, brought it to the place of business of the Walker Motor Company for the purpose of selling it. He was met by Gary, who had him sign a blank bill of sale, and an O.P.A. certificate of transfer. He thereupon left his car there in front of the place of business of the Walker Motor Company. Gary agreed to try and obtain the sum of $650 net to Purvis for the car.

The defendant, T. J. Bailey, had been discharged from the army on 6 April 1946, and had obtained employment with the Veterans Administration Facility which is several miles out from Tuscaloosa. He needed a car to go to and from work. He went to the Walker Motor Company for the purpose of purchasing one. Gary came out and showed him the Chevrolet Coupe left for sale by Purvis and drove him around in it. Gary priced the car to Bailey at $795.

While Bailey was standing around the place of business pondering the trade Max Walker came out and recommended he buy it. Max Walker drove Bailey out to the home of an aunt where Bailey had left some money, and there Bailey got $580 which was given to Max Walker as a down payment on the car. Max Walker claimed the money was paid him before he and Bailey got out of the car. Bailey claimed that they went to the back part of the place of business before the money was transferred as Max told him they did not handle money in front as "somebody might come in." Again according to Bailey after he paid the money to Max Walker he went up to a desk where W. W. Walker was sitting preparing some papers. There he signed a note payable to the Walker Motor Company in the sum of $287.40, secured by a chattel mortgage on the automobile, and received a check in the sum of $215.00 payable to himself. He endorsed the check and returned it to W. W. Walker who placed it in his desk drawer. W. W. Walker then handed him the bill of sale on the car previously signed by Purvis.

This bill of sale was on a blank taken from the supplies of the Walker Motor Company. The blank spaces therein were apparently filled in by Max Walker and Gary, and Gary filled out the O.P.A. certificate of transfer. Both instruments showed the purchase price to be the legal ceiling price of $409. In this connection however it might be noted that known handwriting of W. W. Walker was received in evidence for comparison with some of the writing appearing on the bill of sale.

After the transaction with Bailey the seller Purvis returned to the place of business of the Walker Motor Company. There Gary procured the above mentioned check and paid him in cash the difference owed on the sale of the car.

A day or two after the sale the defendant Bailey returned to the Walker Motor Company accompanied by his uncle.

He first talked to Max Walker, and Bailey's version of this conversation is as follows:

"Well, I asked him about the bill of sale, that it wasn't Walker Motor Company's name on it, and he says 'Well, I didn't buy it that way.' I said 'Well, sir, I got it here.' I says 'Another thing,' I says 'I have got a bill of sale for $409.00;' I says 'Something's wrong.' I said 'They must have given me the wrong bill of sale for the car, because I gave you $580.00 cash money for the car.' He said 'Well—,' says 'Well, 1 will tell you—;' he says 'I thought I explained this stuff to you;' he says 'We are selling them over ceiling price down here;' he says 'We have been selling them over ceiling price for three years.'"

Max Walker testified that he told Bailey on this occasion that the true purchase

price could not be shown on the bill of sale as "we could not put it there for obvious reasons."

He next talked to W. W. Walker. Mr. Walker said that the return visit of Bailey was because he was dissatisfied with the car and he told him that the car could be resold for him.

On 23 May 1946 Bailey made a payment of $47.00 on the mortgage debt, and received a receipt signed "Walker Motor Company, by M. E. Walker."

The appellant has filed some forty-nine assignments of error. Many of these assignments pertain to similar questions and may be grouped for discussion. The appellant, in his brief, has so grouped many of them.

Appellant's Propositions 1 through 7a pertain to assignments of error presenting in various ways the ultimate question of the legality of a contract made in violation of the Federal Emergency Price Control Act of 1942, as amended. 50 U.S.C.A.Appendix, §§ 901 to 946.

Among the declared purposes of the Emergency Price Control Act of 1942 is:

"To eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; * * * to prevent hardships to persons engaged in business * * *." § 901(a).

Section 904(a) of said act provides that:

"It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or here after entered into, for any person to sell or deliver any commodity, or in the course of trade or business to buy or receive any commodity, * * * or otherwise to do or omit to do any act, in violation of any regulation or order under section 2 (section 902 of this Appendix), or of any price schedule effective in accordance with the provisions of section 206 (section 926 of this Appendix), or of any regulation, order, or requirement under section 202(b) or section 205(f) (sec-

tions 922(b) or 925(f) of this Appendix), or to offer, solicit, attempt, or agree to do any of the foregoing."

Section 925(b) of Title 50, supra, provides a sanction to enforce Section 904, supra, in the following language:

"Any person who willfully violates any provision of this act (Section 904 of this Appendix) * * * shall, upon conviction thereof, be subject to a fine of not more that $5,000, or to imprisonment for not more than two years in the case of a violation of section 4(c) (Section 904(c) of this Appendix) and for not more than one year in all other cases, or to both such fine and imprisonment. * * *"

Section 925(e) of Title 50, supra, gives to one who has been charged over ceiling prices in violation of a regulation or schedule fixed under the provisions of Emergency Price Control Act, supra, the right to bring a cause of action against the seller within one year of the date of the transaction, and in such action the seller may be liable for an amount not more than treble the overcharge, or an amount not less than $25 nor more than $50 as the court may in its discretion determine.

In our opinion it is clear that under the provisions set out above that the mortgage and note which are the bases of this suit are illegal and void. The contract, calling for the payment of a price above the O.P.A. ceiling price is declared unlawful. A penalty is fixed for such action. A prohibition must be implied under such conditions. Stanley v. Nelson, 28 Ala. 514; Woods v. Armstrong, 54 Ala. 150, 25 Am. Rep. 671; Milton v. Haden, 32 Ala. 30, 70 Am.Dec. 523. Contracts specially prohibited by law, or the enforcement of which violates the laws enacted for regulation and protection of private citizens are void and non-enforceable in the courts of this state. Terre Haute Brewing Co. v. McGeever, 198 Ala. 474, 73 So. 889; Greil Bros. v. McLain, 197 Ala. 136, 72 So. 410; Gill Printing Co. v. Goodman, 224 Ala. 97, 139 So. 250; Booker T. Washington Burial Ins. Co. v. Roberts, 228 Ala. 206, 153 So. 409.

■■ Appellant's counsel contends strenuously that because of the recent United States Supreme Court decision in the case of Bruce's Juices, Inc., v. American Can Company, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219, and in view of action for treble damages given the purchaser of over ceiling priced commodities under Section 925(e) that contracts violative of Emergency Price Control Act should be enforced in full and the victimized purchaser left to his remedy under Section 925(e), supra. The fact that the purchaser is granted in a separate section a right to, and may, if he chooses, attempt to collect damages where he is the victim of a sale involving over ceiling prices can in no way operate to validate a contract specifically declared unlawful by the act prohibiting such contracts. The expressed purpose and provisions of-the Emergency Price Control Act we think establishes beyond argument the illegality of contracts made in violation of its provisions. Relief sought under contracts unlawful under the Emergency Price Control Act has uniformly been denied by other jurisdictions. Gale & Co. v. Wallace, Ark., 1946, 194 S.W.2d 881; Scott Furniture Co. v. Maurer, 208 Ark. 604, 187 S.W. 2d 185; El Paso.Furniture Co. v. Gardner, Tex.Civ.App., 1944, 182 S.W.2d 818; Morgan Ice Company v. Barfield, Tex.Civ.App., 1945, 190 S.W.2d 847; A. B. Lewis Co. v. Jackson, Tex.Civ.App., 1947, 199 S.W.2d 853; Henderson v. Jones & Laughlin Steel Corporation, D.C.Pa., 46 F.Supp. 518; Toll et al. v. Friedman, Sup., 65 N.Y.S.2d 555; Swanee Fabrics, Inc., v. American Bleached Goods Co., Inc., 178 Misc. 894, 36 N.Y.S. 2d 456; Sommer et al. v. E. B. Kelly Co., Inc., 182 Misc. 157, 47 N.Y.S.2d 57; Mill Factors Corporation v. Bridal Veil & Accessories Co., N.Y.City Ct., 51 N.Y.S.2d 256.

Nor do we think that the doctrine of the Bruce's Juices case, supra, is applicable to or controlling of this case. In that case the Bruce's Juices, Inc., was sued on notes representing several years unpaid balance due on a contract for the purchase of cans. The Bruce Company as one of its defenses asserted that the notes were void because of illegal consideration, in that the Can Company had sold to others at prices which discriminated against Bruce and thereby violated the Robinson Patman Act, 15 U.S. C.A. §§ 13, 13a, 13b, 21a.

In connection with the attempted defense that the petitioner (Bruce) did not allege and did not contend that the notes represent specific transactions or that the sales for which they were given could be identified, the court as a basis of its holding that the federal law did not support the defense alleged, asserted that the contract sued upon was not intrinsically illegal, and that a violation of the Robinson Patman Act, if any, requires at least two transactions, whereas in this case such violation could be found only by resorting to different transactions which a party to the litigation had with third persons who were not parties.

■ We here are dealing with a contract inherently unlawful. And as stated in the majority opinion in the Bruce's Juices case, supra [330 U.S. 743, 67 S.Ct. 1021] (four of the justices were of the view that the contract was unenforceable), "If, in order to prove his own case, a plaintiff proves his violation of law, then no court will aid the plaintiff to recover."

■ Another large group of the appellant's assignments of error question the correctness of the court's action in overruling plaintiffs objection, on cross examination of the plaintiff and his witnesses Max Walker and Gary, to questions whose answers would tend to show that at the time of the transaction in question W. W. Walker was under a federal injunction not to sell automobiles above the allowable O.P.A. ceiling prices. Max Walker and Gary disclaimed knowledge of such injunction. The correctness of the court's rulings as to the questions propounded to them need not therefore be reviewed. The plaintiff, W. W. Walker, stated that he was so enjoined at the time of this transaction.

■ This injunction was not necessarily involved in the pleadings in this case. It came incidentally into issue by cross examination of the plaintiff. Under such circumstances its existence could be established by parol testimony, if otherwise rele-

vant. DeBardeleben v. Sellers, 17 Ala.App. 247, 84 So. 403.

We think there can be no question of its relevancy. The theory of the defense was that a scheme or conspiracy existed between W. W. Walker, then under federal injunction not to sell automobiles above O. P.A. ceiling prices, and Max Walker and Gary, whereby Max Walker and Gary, not so enjoined, could carry on operations of the type shown by the evidence in this case. The fact that W. W. Walker was so enjoined we think clearly would tend to show a motive on his part for such arrangement. Johnson v. Johnson, 201 Ala. 41, 77 So. 335, 6 A.L.R. 1031.

It is our opinion that clearly sufficient evidence was presented to the jury to justify their finding that Max Walker and Gary were ostensibly the agents for the Walker Motor Company in this transaction, and that the alleged arrangement which the plaintiffs contend existed was a dodge and a subterfuge, abhorrent to courts of justice.

It is further our opinion that the jury was justified in finding that the defendant had met his burden of establishing that the automobile was sold in excess of ceiling price and that illegal consideration was part of the mortgage indebtedness secured by the mortgage in this case, so as to preclude the plaintiff from recovering in detinue. Norris v. Kelly, 249 Ala. 281, 31 So.2d 129.

The weight of the evidence on this issue was for the jury. Section 73, Title 9, Code of Alabama 1940; Roberts and Sons v. Williams, 198 Ala. 290, 73 So. 502; Robinson & Co. et al. v. Greene, 148 Ala. 434, 43 So. 797; Birmingham News Co. v. Birmingham Printing Co., 213 Ala. 256, 104 So. 506.

Having concluded that the jury was fully warranted in finding that Max Walker and Gary were agents of the Walker Motor Company, and that the contract which they foisted upon the defendant in this case was illegal, void, and unenforceable, we see no reason to review any further errors alleged by the appellant, for under the above view, and without intimating that there may be

merit in such alleged errors, any action of the trial court would be error without injury in so far as plaintiffs' contentions are concerned.

Affirmed.